WILLIAM G. KELLY, *et al.,*

*v.*

SALLIE BELCHER, *Administratrix, etc., et al.*

(No. 13111)

Submitted February 1, 1972.        Decided March 21, 1972.

Dissenting Opinion March 29, 1972.

*H. D. Rollins, J. E. Litz,* for appellants.

*Stephen P. Meyer, Leo Catsonis, Stanley E. Preiser,* for appellee (Belcher).

HAYMOND, JUDGE:

In this civil action, instituted in the Circuit Court of Kanawha County, West Virginia, August 12, 1969, to impeach an alleged holographic will of Edward H. Kelly, deceased, the circuit court denied a motion of the plaintiffs to set aside and vacate a judgment of dismissal of the action based upon a challenged compromise; and the principal question for decision is whether the plaintiffs, upon the facts, are entitled under Rule 60 (b) of the West Virginia Rules of Civil Procedure to relief from the order of dismissal.

In the original complaint, the plaintiffs were William G. Kelly, a brother of the decedent, Robert Lee Vickers, Leroy Allen Vickers, and Kenneth Kelly Vickers, three of the children and heirs of Inez Vickers, a deceased sister of Edward H. Kelly, and the defendants were Sallie Belcher, Administratrix with the will annexed of Edward H. Kelly, deceased, a sister of Edward H. Kelly, and Maywood Belcher, a son of Sallie Belcher, and Edna Belcher,

his wife, who by the will were given real estate consisting of the home of the decedent and his automobile. The action was filed by Jack O. Friedman of Charleston, West Virginia, as attorney for the plaintiffs at the instance of William G. Kelly, who paid Friedman a $200.00 retainer on his fee but the amount of the fee has not been fixed by any agreement between them.

By order entered January 28, 1970, an amended complaint was filed in which the remaining children of Inez Vickers, deceased, Carl Dean Vickers, Lawrence E. Vickers and Louise Vickers Frericks, were added as plaintiffs. The defendants filed answers to the amended complaint in which they denied the allegation in such complaint that the will in question was not the will of Edward H. Kelly, deceased. By the amended complaint the plaintiffs sought to impeach the will and demanded trial of an issue devisavit vel non by a jury to ascertain whether the writing, which has been admitted to probate by the County Court of Kanawha County, is or is not the true last will and testament of Edward H. Kelly, deceased.

The defendants, Maywood Belcher and Edna Belcher, gave notice that depositions would be taken on April 30, 1970, at which time the compromise which, by motion under Rule 60 (b) of the Rules of Civil Procedure is attacked by the plaintiffs, was negotiated by the attorneys respectively representing the plaintiffs, the defendants Maywood Belcher and Edna Belcher, and the defendant Sallie Belcher, Administratrix with the will annexed.

By order endorsed and approved by the attorneys for all the parties, presented by Jack O. Friedman, and entered by the court on May 1, 1970 upon the representation to the court that all matters had been agreed between the parties, and on the joint motion of the parties that the paper writing involved be declared to be the valid last will and testament of Edward H. Kelly, deceased, it was adjudged and decreed that such paper writing was the valid last will and testament of Edward H. Kelly, deceased, and it was ordered that the action be stricken from the docket of the court.

On November 24, 1970, during the next regular term of court after the term at which the order of May 1, 1970 confirming the compromise was entered, the plaintiffs, represented by attorneys who succeeded Jack O. Friedman, who had been discharged by the plaintiffs, moved the court under Rule 60 (b) of the Rules of Civil Procedure, to set aside and vacate the order of May 1, 1970 and to reinstate this case upon the docket; and the matters arising upon the motion were set for hearing December 17, 1970. At the hearing the court heard the testimony of William G. Kelly, Leroy Vickers and Jacqueline C. Vickers, his wife. No evidence was introduced in behalf of the defendants and the decision of the court upon the motion was based upon the evidence in behalf of the plaintiffs. By final judgment rendered May 17, 1971, the court found that no fraud was perpetrated upon the court by counsel and that there were no conditions or grounds asserted for setting aside or vacating the judgment of May 1, 1970 and denied the motion of the plaintiffs. From the judgment of May 17, 1971 this Court granted this appeal on July 28, 1971 upon the application of the plaintiffs. By leave of this Court the plaintiffs filed their motion to reverse the final judgment of May 17, 1971, and this proceeding was submitted for decision upon the motion to reverse, upon the motion to set aside and vacate the judgment of May 1, 1970, upon the record, and upon the oral arguments and briefs of the attorneys for the plaintiffs and the attorneys for the defendants.

Sometime in April, 1970, the plaintiff, William G. Kelly, who resided in New Haven, Indiana, talked to Friedman by telephone to ascertain the status of the litigation. Following the conversation Kelly came to Charleston on April 28, 1970 and made an appointment to meet, and met, Friedman at his office on the following day and discussed the case with him for approximately an hour and a half. Friedman told Kelly that the Belchers or their attorney, Stanley E. Preiser, of Charleston, wanted to compromise the case but no terms of a compromise were discussed. Kelly agreed to go with Friedman to Preiser's office on the

morning of April 30, at which time, accompanied by the plaintiff Leroy Vickers, Kelly went to Friedman's office where he and Leroy Vickers remained for about thirty minutes and then went with Friedman to Preiser's office to attend depositions or to consider an offer of compromise. Kelly testified that they went to Preiser's office to take depositions or to see what Preiser had to offer and Leroy Vickers testified that Friedman said "Let's go over and see what they have to say."

Upon arrival at Preiser's office, Kelly and Leroy Vickers saw Maywood Belcher and Edna Belcher and Kelly, Vickers and Friedman went to a reception room where Kelly and Vickers remained for about forty-five minutes. Shortly after entering the reception room Friedman went into another room and later he took Kelly and Leroy Vickers to a conference room where they remained for some time. Friedman, from time to time, left the conference room and went into another office where, he said, the attorneys were working on a compromise. After a time he returned to the conference room and according to Kelly said "We will have the papers ready in a few minutes." Sometime later Friedman came into the room with a paper and, according to Kelly, said "This is a third", and handed the paper to Vickers and said "it was a third". Kelly testified that he thought that two-thirds of the estate was involved and that by the compromise Kelly was to receive one-third and the Vickers heirs were to receive one-third. Kelly also testified that Preiser came into the room, shook hands with him and said "There is $5,666.66 that we wouldn't have got if it had went to court.", and that Friedman introduced Leroy Vickers to Preiser and that Preiser said the same thing to Leroy Vickers. The paper that Friedman produced was the release involved in this case and it was signed first by Kelly and then by Leroy Vickers, who agreed to "distribute it" to the other Vickers heirs and Friedman told him to obtain their signatures to the release and then to send it to him.

After they had been in Preiser's office about three hours, Kelly, Vickers and Friedman left Preiser's office and

walked together toward Friedman's office until they came to the place where Kelly's car had been parked. There they left Friedman and Kelly drove Vickers to his home in Marmet and then went to the home of his sister-in-law in Chelyan from which, after having lunch, he left for his home in Indiana about 2:00 o'clock and arrived at his home about 9:00 o'clock that evening.

Leroy Vickers testified to substantially the same facts as those testified to by Kelly with respect to what occurred at Friedman's office and at Preiser's office except that Leroy Vickers stated that he learned while the attorneys were negotiating the compromise that they discussed by telephone the value of the real estate and the automobile with appraisers and automobile salesmen and valued the real estate at $15,000.00 instead of $12,000.00 and the automobile at $2,000.00 or a total of $17,000.00 which was the basis of the compromise. The personal property of Edward H. Kelly was originally valued at about $11,000.00 and the real estate at $12,000.00 or a total estate value of about $23,000.00.

Kelly and Leroy Vickers both testified that they understood that by the compromise Kelly was to receive one-third of the estate and the Vickers heirs were to receive one-third, that, in any event, Sallie Belcher was entitled to one-third of the estate, and that only the other two-thirds was involved in the compromise. Kelly testified that he read the release but did not understand it and Leroy Vickers testified that Kelly glanced through it but did not have time to read it and that "I didn't hardly even glance at it." He admitted that he signed the release but stated that he did not understand it. They both testified that they did not know when they signed it that by the compromise Kelly and the Vickers heirs were to receive only one-third together instead of one-third each of the estate.

The release was signed by Kenneth Vickers and was left by Leroy Vickers at his home that evening where, during his absence, his wife, Jacqueline C. Vickers, examined the

release. After discussing it with his wife Leroy Vickers called a lawyer acquaintance by telephone and read the release to him. He advised him that according to the release Kelly and the Vickers heirs together received one-third instead of two-thirds of the estate.

After learning that Kelly and the Vickers heirs were to receive only one-third together instead of one-third each by the compromise, Leroy Vickers informed William G. Kelly by telephone later that night of the effect of the release and Kelly advised him that he would not accept the compromise and Kelly also informed Friedman to that effect by a telephone call on May 7. Leroy Vickers called Friedman on the evening of May 1 and informed him that he did not agree with the release and after Leroy Vickers and his wife informed the other Vickers heirs about the release they refused to sign it.

In the May 7 conversation with Friedman, Kelly directed him to deliver handwriting specimens to Leroy Vickers and told Friedman that "he was going along with Leroy." By letter of May 13, Friedman informed Kelly of his discussions of the release with Leroy Vickers and that the Vickers heirs did not desire to settle the case in accordance with the terms previously determined, that he had advised the court that the case would have to be reopened, and that it was continued until the September term of the court. In that letter he suggested that a meeting be held by all the plaintiffs to determine ground rules for the future conduct of the litigation.

On May 28, Friedman again wrote Kelly stating that he had received no response from him or Vickers and requested Kelly to contact him as soon as possible. Kelly did not respond to either of those letters. By letter dated June 2, 1970, prepared by the wife of Leroy Vickers in behalf of Kelly and two of the Vickers heirs, Friedman was discharged and a statement for his services was requested. Friedman wrote Kelly on June 10, 1970 and informed him that the file would be forwarded to whomever he designated upon payment of Friedman's fee. He wrote again on

June 23 and informed Kelly that he had received a certified check in the amount of $5,666.66 representing the full settlement according to the agreement reached in Preiser's office on April 30 and enclosed a copy of the May 1 order. He also stated that his fee was $2,000.00, that after crediting the retainer of $200.00 the balance of the fee was $1,800.00 and that after deducting the $2,000.00 fee from the $5,666.66 there remained $3,666.66 for distribution to Kelly in the amount of $1,833.33 and to each of the six Vickers heirs in the amount of $305.55, and he enclosed his checks in those amounts. The checks were never accepted by Kelly or the Vickers heirs and were returned to Friedman by letter prepared by Mrs. Vickers with the comment that the settlement had not been agreed to, that Friedman had no authority to settle the claim, and that recourse might be sought from the Legal Ethics Committee.

In a letter of July 1 Friedman told Kelly that he and Leroy Vickers had agreed to the settlement and had executed a release, that Friedman had not been informed of the dissatisfaction until several weeks after the compromise had been executed, that he would not be intimidated by threats of recourse to the Ethics Committee, suggested that the plaintiffs consult an attorney who should contact him, and said that he intended to turn the matter of payment over to a special receiver. The release was never signed by the other four Vickers heirs. Though Friedman made requests that the release signed by Kelly and Leroy Vickers and Kenneth Vickers be returned to him it has never been delivered to Friedman.

The release, except the title and the signatures and the spaces for signatures, is in this form:

"The undersigned, for and in consideration of the payment to their attorney Jack O. Friedman, the sum of $5,666.66, do hereby fully and forever release and discharge Sallie Belcher, Maywood Belcher and Edna Belcher from any and all claims, causes, causes of action, demands or judgment which any of the undersigned have had, now have, or shall hereafter have, against the said

Sallie Belcher, Maywood Belcher and Edna Belcher, whether at law or in equity, and more especially release and discharge any claim that the purported written Will of Edward H. Kelly, Deceased, is invalid, it being agreed that the writing claimed to be the Last Will and Testament of Edward H. Kelly, Deceased, is the valid Last Will and Testament of Edward H. Kelly, Deceased; and it is agreed as part of this Release that the undersigned will cause to be entered in the Circuit Court of Kanawha County an Order declaring said Last Will and Testament to be the valid Last Will and Testament of Edward H. Kelly, Deceased.

"WITNESS the following signatures and seals as of this the 30th day of April, 1970."

The order advising the court that the matters in the case had been agreed between the parties, dated and entered May 1, 1970, presented by Friedman and approved by Meyer and Preiser as attorneys for the defendants, is couched in this language:

"This day came the plaintiffs by Jack O. Friedman, their attorney, and came the defendants, Maywood Belcher and Edna Belcher, by Stanley E. Preiser, their attorney, and came the defendant, Sallie Belcher, by Stephen P. Meyer, her attorney, and the parties represented unto the Court that all matters in this case have been agreed between the parties and all parties jointly move that the paper writing involved in this suit be declared to be the valid Last Will and Testament of Edward H. Kelly, Deceased; and there being no objection thereto, it is hereby ADJUDGED, ORDERED and DECREED that the paper writing which was admitted to Probate by the County Court of Kanawha County, West Virginia, a copy of which was attached as an exhibit to the complaint in this case, is the valid Last Will and Testament of Edward H. Kelly, Deceased.

"There being nothing further to be done in this case, the Clerk is ORDERED to strike this case from the docket."

It should be noted that the release states that it is agreed as part of the release that the signers of the release will cause an order declaring the last will and testament to be the valid last will and testament of Edward H. Kelly, deceased, to be entered in the Circuit Court of Kanawha County. Kelly testified that he did not know that the order had been entered until the time he received a letter from Friedman dated May 13, 1970. Leroy Vickers testified that he did not know that the order had been entered until June 6, 1970. Kelly and Leroy Vickers both testified that Friedman was authorized to represent them and the other Vickers heirs as their attorney in the case but Kelly also testified that he never told Friedman that he could settle the case for any certain sum and that he did not authorize Friedman to dismiss the case or have a settlement order entered in it.

Though the evidence shows that Kelly discussed the case with Friedman for more than an hour on April 29, 1970, that Kelly and Leroy Vickers were in Friedman's office for approximately thirty minutes on the morning of April 30, before they left for Preiser's office to attend a deposition or to discuss a compromise of the case, and that Kelly and Leroy Vickers were at Preiser's office for approximately three hours when the compromise was negotiated by the attorneys and the release was prepared and presented to Kelly and Leroy Vickers and signed by them, the evidence does not disclose that terms of any compromise were ever mentioned, or that any specific or approximate sum was ever considered by them as a basis of compromise, or that any tentative terms or amounts were ever submitted to them for their approval or rejection before the compromise was concluded by the attorneys and before Kelly and Leroy Vickers were informed of the result of the negotiations and presented with the release for their signatures. In short, the evidence fails to show that either Kelly or Leroy Vickers was informed of the terms of the compromise before it was concluded by the attorneys, or that either Kelly or Leroy Vickers was advised of the terms of the compromise while the attorneys were

engaged in their discussion or participated in such discussions, or that either of them consented to the compromise at any time after they became aware of its terms. Furthermore, it appears from the evidence that neither Kelly nor Leroy Vickers understood the terms or basis of the compromise at the time they signed the release but instead thought that Kelly was to receive one-third of the amount in controversy and that the Vickers heirs were to receive one-third of that amount instead of one-third to them together, and that they did not know or fully understand the basis of the compromise until Jacqueline C. Vickers, the wife of Leroy Vickers, questioned the compromise and until Leroy Vickers, by consulting an attorney, was informed of the actual basis of the compromise and imparted that information to Kelly later that evening. It further appears from the evidence that the compromise when understood by Kelly and the Vickers heirs was never approved and the checks tendered by Friedman were never accepted but were returned to him promptly. The evidence in its entirety does nothing more than show that Kelly and Leroy Vickers authorized Friedman to enter into compromise negotiations; it fails to show that Friedman was authorized to conclude the compromise on the basis effected by Friedman, Preiser and Meyer without the knowledge, consent or approval of Kelly and Leroy Vickers which did not occur at any time during the negotiations between the attorneys.

The well settled and widely recognized general rule is that an attorney who is clothed with no other authority than that arising from his employment as attorney has no implied power by virtue of his general retainer to compromise and settle a claim or cause of action of his client.

Annotation, § 2, 30 A.L.R.2d 945. The rule has been recognized and applied in numerous federal court decisions and by the decisions of appellate courts in many states and by this Court.

In *Dwight* v. *Hazlett*, 107 W.Va. 192, 147 S.E. 877, 66 A.L.R. 102, this Court held in Point 5 of the syllabus that

"The mere relation of attorney and client does not clothe the attorney with implied authority to compromise a claim of the client." In that case this Court also held in Point 6 of the syllabus that "Where an attorney makes a compromise unauthorized by his client and consents to a judgment thereon, the judgment may be vacated upon the application of the aggrieved client, seasonably made." The opinion in that case also contains this quotation: "The general rule is that an attorney has no power or authority to compromise or settle a case without express or implied authority, and where a judgment is based upon such compromise, said judgment may be set aside and vacated in the same manner as other judgments may be vacated by the aggrieved client when application is promptly presented." In *Rader* v. *Campbell,* 134 W.Va. 485, 61 S.E.2d 228, the opinion states that "It is agreed that the general employment of a lawyer in a pending case does not clothe him with authority to settle or compromise." A client may, of course, give an attorney special or express authority to compromise or settle his cause of action, but such authority must be clear and unequivocal. *Bursten* v. *Green,* (Fla.), 172 So. 2d 472.

In *Freeman* v. *McCarthy,* (3rd Cir.), 153 F.2d 1001, the opinion contains this quotation from *Preveden* v. *Hahn,* (D.C., S.D., N.Y.), 36 F. Supp. 952: "The attorney for the plaintiff, who signed the consent dismissing the action, admits in an affidavit on file that he had no express authority to do so, and this is the fact. Defendants apparently do not claim otherwise, but contend that such authority existed by implication in the attorney's retainer. In this contention the defendants are wrong. An attorney has no right to settle his client's case nor to consent to a dismissal of it upon the merits which in effect is a release of the claim, without express authority from his client. No such authority is implied in a mere retainer. White v. Joyce, 158 U.S. 128, 129, 15 S.Ct. 788, 39 L.Ed. 921; Kingsbury v. Buckner, 134 U.S. 650, 10 S.Ct. 638, 33 L.Ed. 1047; United States v. Beebe, 180 U.S. 343, 21 S.Ct. 371, 45 L.Ed. 563; Schram v. Poole, 9 Cir., 111 F.2d 725; Countryman v.

Breen, 241 App.Div. 392, 271 N.Y.S. 744. The order in question was therefore not valid and the plaintiff did not learn of its entry until several months had passed."

In *Northwest Realty Company* v. *Perez,* 80 S.D. 62, 119 N.W.2d 114, the court held that a judgment pursuant to a compromise by an attorney without the authority of his client may be vacated upon the application of the client. In *Bice* v. *Stevens,* 160 Cal. App. 2d 222, 325 P.2d 244, the opinion contains this language: "The policy of the law is to have every litigated case tried on its merits; and it looks with disfavor upon a party who, regardless of the merits of his case, attempts to take advantage of the mistake, surprise, inadvertence, or neglect of his adversary. * * *. The gist of plaintiffs' motion was that without their knowledge or consent they were deprived of their day in court to litigate their claim on the merits. The record, without conflict, supports their contention. To hold otherwise would be to erode a client's authority to control the cause of action and the subject matter of the litigation."

The motion of the plaintiffs to set aside and vacate the judgment of May 1, 1970, is based upon Rule 60 (b) of the Rules of Civil Procedure, and the grounds assigned, among others, are that the entry of the judgment of May 1 perpetrated a fraud upon the court, that plaintiffs did not consent to the entry of the judgment, and that their attorney exceeded his authority in obtaining the dismissal of the action.

Rule 60 (b) to the extent here pertinent, provides that: "On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) Mistake, inadvertence, surprise, excusable neglect, or unavoidable cause; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59 (b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;

(4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), (3), and (6) not more than eight months after the judgment, order, or proceeding was entered or taken."

Rule 60 (b) has been considered by this Court in *Intercity Realty Company* v. *Gibson,* 154 W.Va. 369, 175 S.E.2d 452. In that case this Court held in Point 3 of the syllabus that a motion to vacate a default judgment under the rule is addressed to the sound discretion of the court and that the ruling of the trial court on such motion will not be disturbed on appeal unless there is a showing of an abuse of such discretion and affirmed the action of the trial court in denying the motion to vacate. Rule 60 (b) of the Federal Rules of Civil Procedure which in many respects is identical with Rule 60 (b) of the West Virginia Rules of Civil Procedure has been interpreted and applied in many decisions of the federal courts.

As heretofore indicated, it is clear from the evidence that the attorney for the plaintiff was not authorized to conclude the compromise, that the compromise was never consented to or approved by the plaintiffs, that the compromise was not completed and that counsel for the plaintiffs in negotiating the compromise and in obtaining the entry of the judgment of May 1, 1970, was acting under a misunderstanding and in the mistaken belief that he was authorized to conclude the compromise and obtain the entry of the judgment. The contention of Friedman that the compromise was concluded and that the release "had nothing to do with the settlement" and only gave additional protection to Preiser's clients, is not correct. The provision in the release that it is agreed as part of the release that the signers of the release will cause the entry of an order declaring the last will and testament to be the

valid last will and testament of Edward H. Kelly, deceased, indicates clearly that such order was not to be entered until the release was executed and delivered which, of course, never occurred. The action of Friedman in concluding the compromise and in obtaining the entry of the judgment of May 1, 1970, which he appears to have done in good faith, constituted a misunderstanding, misapprehension or mistake within the applicable provision of Rule 60 (b) and was also a reason justifying relief from the operation of the judgment within applicable provision (6) of the rule.

In BARRON AND HOLTZOFF, FEDERAL PRACTICE AND PROCEDURE, Rules Edition, Volume 3, Section 1325, in enumerating instances under Rule 60 (b) of the Federal Rules of Civil Procedure in which relief from a judgment may be ordered, the text contains this language: "Relief from a judgment may be ordered under Rule 60 (b) (1) for a variety of reasons. Thus the oversight of a law clerk in failing to serve a more definite statement of claim may be ground for vacating a judgment dismissing the complaint. The entry of a referee's order may be vacated because based on a misunderstanding of the terms of counsel's authority and the latter's consent to the order. A judgment entered by consent induced by reliance upon erroneous representations by government enforcement officers as to the violation of price control regulations may be vacated for excusable neglect regardless of the availability of counsel. A default judgment entered after service of process which was sufficient to confer jurisdiction but of which the defendant had no actual notice without fault on his part should be set aside. Likewise a default suffered by reason of a misunderstanding as to appearance and representation by counsel may be vacated, as may also a default suffered through the excusable neglect of counsel preoccupied with other litigation, or the mistake or excusable neglect of a party not represented by counsel."

In *Patapoff* v. *Vollstedt's Inc.*, (9th Cir.), 267 F.2d 863 the court held that where, after a petition in voluntary

bankruptcy, the defendant executed an admission or confession of bankruptcy and was adjudicated a bankrupt and made a prompt showing that she had a defense which she was misled into waiving through the alleged erroneous action of her attorney, the defendant was entitled to have the adjudication vacated under the provisions of Rule 60 (b) of the Federal Rules of Civil Procedure. The opinion contains these statements: "We think that on this record it was an abuse of discretion for the court to deny the motion to vacate the adjudication. Rule 60 (b) is clearly designed to permit a desirable legal objective: that cases may be decided on their merits. The recent cases applying Rule 60 (b) have uniformly held that it must be given a liberal construction. * * * Since the interests of justice are best served by a trial on the merits, only after a careful study of all relevant considerations should courts refuse to open default judgments.' Tozer v. Charles A. Krause Milling Co., 3 Cir., 189 F.2d 242, 245; accord, Bridoux v. Eastern Air Lines, D.C.Cir., 214 F.2d 207, 210."; and "As stated by Mr. Justice Black in Klapprott v. United States, 335 U.S. 601, 614, 69 S.Ct. 384, 390, 93 L.Ed. 266: 'In simple English, the language of the "other reason" clause, for all reasons except the five particularly specified, vests power in courts adequate to enable them to vacate judgments, whenever such action is appropriate to accomplish justice.'" See also *Leong* v. *Railroad Transfer Service, Inc.,* (7th Cir.), 302 F.2d 555; *United States* v. *Gould,* (5th Cir.), 301 F.2d 353.

Though upon the cross-examination of Kelly and Leroy Vickers they were asked if they knew that Maywood Belcher and Edna Belcher had made substantial repairs to the home to which they were entitled under the compromise, both Kelly and Leroy Vickers, in response to such questions, stated that they did not know that the Belchers had made any improvements to the home. As the motion was heard and determined upon the evidence in behalf of the plaintiffs and no evidence was introduced in behalf of the defendants Maywood Belcher and Edna Belcher to show expenditures for improvements to the home, it does

not appear that reversal of the order confirming the compromise will be prejudicial to the defendants Maywood Belcher and Edna Belcher or will impose any burden other than to deprive them temporarily of the use of the money advanced by them in connection with the compromise.

At the beginning of the hearing on December 17, 1970, the circuit court indicated that the plaintiffs had misconceived their remedy and suggested three available alternative remedies; but the court heard the motion, correctly found that in obtaining the entry of the order of May 1, 1970 Friedman did not perpetrate fraud upon the court, and denied the motion by the final judgment of May 17, 1971.

Under Rule 60 (b) which should be liberally construed for the purpose of accomplishing justice, the granting or refusal of relief is within the sound discretion of the court. It is clear that under the evidence, the substance of which has been outlined in this opinion, the circuit court should have sustained the motion of the plaintiffs and should have set aside and vacated the dismissal order of May 1, 1970. Numerous cases hold, upon the particular facts of each case, that the refusal to grant relief afforded by the rule constitutes abuse of discretion. See *Spann* v. *Commissioners of the District of Columbia,* (D.C.Cir.), 443 F.2d 715; *Bibeau* v. *Northeast Airlines, Inc.,* (D.C.Cir.), 429 F.2d 212; *Butner* v. *Neustadter,* (9th Cir.), 324 F.2d 783; *Leong* v. *Railroad Transfer Service, Inc.,* (7th Cir.), 302 F.2d 555; *Negron* v. *Peninsular Navigation Corporation,* (2nd Cir.), 279 F.2d 859; *Russell* v. *Cunningham,* (9th Cir.), 279 F.2d 797; *Tozer* v. *Charles A. Krause Milling Company,* (3rd Cir.), 189 F.2d 242; *Fleming* v. *Huebsch Laundry Corporation,* (7th Cir.), 159 F.2d 581.

Rule 60 (b) should be liberally construed to accomplish justice, and when it appears from the evidence that an order of dismissal confirming a compromise resulted from a misunderstanding or mistaken belief of the attorney for the parties whose cause of action was dismissed by virtue

of the compromise and that such compromise was unauthorized and was not consented to by such parties, the judgment of the trial court denying their motion to set aside and vacate the order of dismissal constituted an abuse of discretion and such judgment will be reversed upon appeal.

The motion to reverse is granted, the judgment of the circuit court denying the motion to set aside and vacate the dismissal order of May 1, 1970 is reversed, and this proceeding is remanded to that court for such further proceedings as may be proper in conformity to the principles enunciated in this opinion.

> *Motion to reverse granted;*
> *judgment reversed and*
> *case remanded.*

CARRIGAN, JUDGE, dissenting:

I respectfully dissent from the majority opinion. While the statement of the law as contained in Syllabus Points 1 and 2 may be correct, I feel that they do not apply to the facts of this particular case.

There are two issues in this case: namely, (1) Did Friedman, the attorney for Kelly and the Vickers heirs, act under a mistake and without authority in entering the dismissal order, and (2) did the circuit court abuse its discretion in refusing to set aside the dismissal order? The majority opinion would set aside the dismissal order on the basis of a misunderstanding or mistake on Friedman's part which would bring this under the provisions of Rule 60(b) R.C.P. I do not believe that this conclusion is supported by the facts and the circumstances.

Kelly, on his own behalf, and Leroy Vickers, ostensibly in behalf of the Vickers heirs, were the moving parties in the employment of Friedman, their attorney, and in the effort to set aside the Kelly will. It appears that they conferred with their attorney during the negotiations on the settlement and compromise of the will case and that they

were present at the time the proposed settlement was announced to them by their attorney and that both Kelly and Leroy Vickers at that time signed a release showing their concurrence and agreement to the compromise and dismissal of their suit. If they had any questions as to the compromise or did not understand its terms, as they now contend, they should have inquired of their attorney at that time. Therefore, this is not a case in which Friedman, as attorney for Kelly and the Vickers heirs, acted under a mistaken belief that a compromise settlement had been agreed to by his clients, since all the facts surrounding their negotiations and conversation indicate that in fact they had approved the settlement agreement.

To adopt the contention of Kelly and the Vickers heirs as to their claimed understanding of the settlement, which is that Kelly should receive one-third, the Vickers heirs should receive one-third and Sallie Belcher, one-third, leaving the Maywood Belchers, the parties who would have taken the property under the terms of the will in question, with nothing, is no compromise of the matter between the contesting parties and is incredulous on its face.

I do not believe that the Circuit Court of Kanawha County was guilty of abusing its discretion in refusing to set aside the dismissal order but, to the contrary, I believe that the evidence in this case is sufficient and adequate to support the ruling of the circuit court.

This Court has held in *Intercity Realty Company* v. *Gibson,* 154 W.Va. 369, 175 S.E.2d 452 (1970), that a motion to set aside a default judgment is addressed to the sound discretion of the court and the court's ruling will not be disturbed unless there is a clear showing of abuse of such discretion. In the *Intercity Realty* case, the default judgment arose through no fault or neglect of the party but rather through her attorney's inaction, and without the client's knowledge. In the present case, Kelly and Vickers knew, or should have known, that their action was to be dismissed as a part of the compromise settlement.

The majority opinion will seriously affect the validity and finality of dismissal orders in compromise cases. I am fearful for the plight of attorneys in the future who desire to enter into a compromise settlement of a case, since it will permit clients, after agreeing to a compromise settlement of an action and after their attorney has acted in reliance upon the approval of their clients, to then seek to have the dismissal order set aside, under the ruling of the majority as it applies Rule 60(b), R.C.P., on the basis of mistake or any other reason justifying relief, simply because the clients later become dissatisfied with the terms of the compromise to which they had previously agreed.

For the foregoing reasons I would have affirmed the judgment of the Circuit Court of Kanawha County.

I am authorized to say that Judge Caplan concurs in the views expressed in this dissent.